## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEVEN LANG KANAI** | * | |
| | * | |
| **Petitioner** | * | |
| | * | |
| **v.** | * | **Civil No. PJM 09-1597** |
| | * | |
| **PETE GEREN, Secretary of the** | * | |
| **U.S. Army** | * | |
| | * | |
| **Respondent** | * | |
| | * | |

## OPINION

Steven Lang Kanai, a former cadet at the United States Military Academy at West Point ("USMA" or "the Academy"), has applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging his "custody" by the U.S. Army. He appeals the denial of his application for discharge as a conscientious objector ("CO") as determined by a 3-2 vote of the Department of the Army Conscientious Objector Review Board ("DACORB"). For the following reasons, Kanai's application for a writ of habeas corpus is granted.[1]

## I.

In June 2004, while enrolled at the University of North Carolina at Chapel Hill, Kanai applied and was admitted to the USMA. A.R. 83-103. Through three years at the Academy, he was rated highly by his peers, was selected to serve as First Sergeant of his company during the

---

[1] The Government responded to the petition for the writ by filing a Motion for Summary Judgment [Paper No. 11]. Although a defense motion for summary judgment seems unusual in a habeas case, it is not without precedent. *See Keil v. Seaman*, 314 F. Supp. 816, 823 n.3 (D. Md. 1970) (denying the Government's motion for summary judgment and granting writ). The parties agree that since the Motion effectively answers the petition and since no evidentiary hearing is necessary, the Court may proceed to consider the merits of the petition. Given that the Court has determined to grant the writ, the Motion for Summary Judgment will be **DENIED**.

second semester of junior year, and served on battalion staff during the first semester of his

senior year.  Kanai states that in August 2007, at the beginning of his senior year, he began to

entertain doubts about his future in the military and approached his Tactical Officer, Major Van

Antwerp, about the possibility of resigning.  Major Van Antwerp reminded Kanai that he had

made a commitment to the Army and that he should take time to think things over before

initiating separation proceedings.  A.R. 180.  A few days later, Kanai informed Major Van

Antwerp that he had decided to stay at the USMA.  *Id.*

In the Fall of 2007, the USMA informed all senior class members of their assigned

military speciality branch.  Kanai was initially assigned to the Armor branch, but advised Major

Van Antwerp that he would rather serve in the Infantry.  *Id.*  Major Van Antwerp therefore

arranged with the branch selection committee for an additional Infantry slot to be created for

Kanai.  *Id.*  In exchange, Kanai agreed to incur an additional three years of active duty service.

A.R. 129-130.  Approximately one month later, Kanai requested that Major Van Antwerp find

out whether it would be possible for him to be released from the additional service obligation.

A.R. 180.  Major Van Antwerp conferred with the Infantry branch representative, but the latter

stated that the additional service obligation was final and could not be revoked.  *Id.*

On May 1, 2008, Kanai again informed Major Van Antwerp that he was considering

withdrawing from the Academy.  This time he could not be persuaded to remain and submitted a

formal resignation request to Major Van Antwerp.  In relevant part, the request stated:

> I find that I am incompatible with the lifestyle and culture of the military.  I cannot accept
> further training to fight a war.  My experience at the Academy leads me to the conclusion
> that the military culture conflicts greatly with my values which have developed since
> entry into the Corps of Cadets.  Likewise, I cannot, in good conscience, accept any role,
> combative or non-combative, in this war . . . . I believe conflicts between the peoples of
> the world should be resolved without resorting to war . . . .

2

A.R. 194.  Major Van Antwerp recommended that the USMA approve Kanai's resignation, that

it discharge him from the USMA, and that it order him to serve as an enlisted soldier for five

years.  However, the Major wrote to his superior:

> I do not believe Cadet Kanai is a conscientious objector as per his statement.  I also do
> not believe that his values, other than his lack of a sense of duty or selfless service, are
> inconsistent with Army service.  I believe that his desire to avoid service is motivated
> almost entirely by a selfish desire to pursue his own interests, despite the commitment he
> has already made.  He seems to think that this commitment is something that can be
> negotiated or purchased and I believe that he does not have a full understanding of the
> weight of the decision he is making.

A.R. 116.  On May 12, 2008, Regimental Tactical Officer Lieutenant Colonel Robert M.

Mundell interviewed Kanai and recommended that his request to resign from the USMA be

denied, noting that his resignation is "contrary to the purpose of this institution and its duty to

the Army and our nation."  A.R. 115.  In his denial, Lieutenant Colonel Mundell stated that

"Cadet Kanai's sense of duty and commitment to his choice to serve the Army and this nation

are incompatible based on his selfish desire to live a life void of responsibility and commitment

to a cause greater than himself."  *Id.*  On May 14, 2008, the Brigade Tactical Officer wrote to

Lieutenant General F.L. Hagenbeck, the Superintendent of West Point, and recommended that

Kanai be separated from the USMA and transferred to the Army reserves for a period of three

years.  A.R. 110.

On May 19, 2008, while his resignation from the USMA was pending, Kanai submitted

an application for separation on the basis of conscientious objection.  A.R. 41-45.  In addition to

his written application, Kanai submitted six letters of support from friends and instructors.  A.R.

51-56.  As part of the CO process, Kanai was interviewed by a military chaplain.  A.R. 49-50.

The chaplain was unsupportive of Kanai's application and submitted a two-page report in which

he opined that Kanai's professed beliefs were incoherent, contradictory and demonstrated a lack

of depth of sincerity.  According to the chaplain, it was "difficult to decide which is worse in

CDT Kanai's argument: mere insincerity, or positions that are half-baked and contradictory to

the point of silliness."  A.R. 50.

On May 23, 2008, before an Investigating Officer had been appointed to investigate

Kanai's CO application per CO procedures for evaluating such claims,[2] the Staff Judge Advocate

("SJA") submitted a Legal Advice Memo to the Superintendent of West Point, Lieutenant

General Hagenbeck, laying out the possible courses of action the Superintendent could take with

respect to Kanai's application for resignation.  SJA's Legal Advice to the Superintendent (May

23, 2008).  The SJA informed the Superintendent that Kanai had recently submitted a CO

application, and recommended that the Superintendent take no action on the USMA resignation

until the conclusion of the CO investigation.  *Id.*  Notwithstanding this advice, Lieutenant

General Hagenbeck recommended that Kanai be separated from the USMA and be required to

---

[2] An application for CO status is a multi-stage process.  First, the applicant submits a formal application and any supporting materials to his immediate commanding officer.  Army Reg. 600-43, ¶ 2-1(a).  The application is then submitted to an interviewing chaplain, who submits a detailed report to the commander, commenting on the nature and basis of the claim, opinion on the source of the beliefs, sincerity and depth of conviction, and appropriate comments on demeanor and lifestyle.  Army Reg. 600-43, ¶ 2-3.  The application is next forwarded to a military mental health physician, who evaluates whether the applicant is suffering from any mental disease or defect.  Army Reg. 600-43, ¶ 2-3(b).  If the applicant is able to cooperate intelligently in the administrative proceedings, an Investigating Officer ("IO") from outside the applicant's chain of command is appointed to review the evidence, hold a hearing, and write a report.  Army Reg. 600-43, ¶ 2-4, 2-5.  The IO's report and the entire case file is then forwarded through command channels for review and recommendation.  Army Reg. 600-43, ¶ 2-6.  An applicant has the opportunity to comment or rebut these additional recommendations.  Eventually, the entire package is forwarded to the DACORB, which makes the final determination on all applications for discharge on the basis of conscientious objection.  Army Reg. 600-43, ¶ 2-8(a).

serve on active duty as an enlisted soldier for three years.  A.R. 109.  Meanwhile, the CO investigation continued forward.

On June 9, 2008, Lieutenant Colonel Dale Henderson, a member of the faculty at West Point, was appointed Kanai's Investigating Officer ("IO") and directed to undertake an investigation, hold a hearing to assemble the relevant facts, and make a recommendation regarding Kanai's CO application.  A.R. 35-36.  Over approximately one month, the IO conducted an extensive investigation, including interviewing Kanai under oath and questioning him on his religious beliefs, the evolution and timing of these beliefs, and his training at West Point.  The IO also gathered, reviewed, and evaluated documents, including Kanai's CO application, the six statements submitted in support of Kanai's application, Kanai's journal entries, and reports by the chaplain and psychiatrist who had interviewed Kanai in connection with his CO application.

On the basis of this investigation, the IO concluded that Kanai's "professed beliefs constitute conscientious objection" as defined by Army Regulation 600-43, and recommended that he be classified as a 1-0 conscientious objector.  A.R. 30-32.  He wrote:

> Throughout the investigation, interviews, and hearing, I have found consistent evidence that Cadet Kanai is a fundamentally honest person.  I must consider the consistency of this record when evaluating Cadet Kanai's own statements about his beliefs, the foundation for those beliefs, and his sincerity in expressing those beliefs.  Likewise, I have found a consistent description of Cadet Kanai's personality as quiet, thoughtful, and capable of examining deep questions from perspectives that are not commonly held.  The evidence for this conclusion comes from the letters at [A.R. 51-56], from the testimony of COL Krawczyk described in [A.R. 73], his evaluations by the department of English, my interviews, and the hearing.

A.R. 31.

Pursuant to Army Regulation, the IO's report and the entire case record were forwarded

5

for review and recommendation by four officers in Kanai's chain of command.  *See* Army Reg.

600-43, ¶ 2-6.  All four members of the chain of command recommended disapproval of the CO

application.  A.R. 177-181.   In September 2008, these recommendations for disapproval were

provided to Kanai for his comment and rebuttal.[3]

_____

[3] The Court is troubled by the USMA's failure to supply Kanai with relevant documents either at all or in timely fashion.

[a] The first document not supplied until this litigation commenced was the SJA Legal Advice Memo to the Academy Superintendent sent in connection with Kanai's application to resign from the Academy, recommending that the Superintendent take no action until the conclusion of the conscientious objector investigation, a recommendation the Superintendent ignored.  At oral argument, counsel for the Army suggested that the SJA recommendation and the Superintendent's decision in connection with the application for resignation were not supplied because the resignation process is distinct from the CO process.  This argument is unconvincing in at least two important respects.  As set forth in the text *infra*, the Second Line Officer on the DACORB, who voted to deny Kanai's CO application, specifically adverted to the correctness of the Superintendent's decision with respect to the resignation application.  ("The Superintendent made the proper recommendation for this resignation and discharge to proceed.")

More importantly, as further developed in the text *infra*, the Superintendent's decision with respect to the resignation application – given that the SJA's Legal Advice Memo points out that the application for resignation "alludes to [Kanai's CO] belief" – coming as it did before the chain of command had opined in the CO case, almost certainly had an inappropriate influence on the CO decisions of the junior officers in Kanai's chain of command.

[b] The second document the Academy never supplied to Kanai was a copy of the SJA Legal Review to the Superintendent, which was required to be considered by the Superintendent prior to him making a recommendation as to Kanai's CO application.  Army Reg. 600-43, ¶ 2-6(d).  On September 5, 2008, Superintendent Hagenbeck ordered that the SJA provide him with a Legal Review of Kanai's CO claim and to make a recommendation as to that claim.  A.R. 12.  Inexplicably, on the same day the Superintendent ordered the Legal Advice Memo, he denied the CO application.  Just as Kanai was entitled to see the SJA Legal Advice Memo in connection with the application to resign the Academy, he was entitled to examine the Legal Advice Memo related to the CO application.

[c] The third document not supplied to Kanai until this litigation was a Legal Advice Memo transmitting the administrative record to the DACORB.  The Army suggested at oral argument that this was inconsequential because it only concerns the reasons for the late submission of the CO application to the DACORB and was not evidence relied on by the DACORB in evaluating the CO application.  However, absent extraordinary circumstances, Army regulations require that the Army forward to CO application to the DACORB within 90 days.  Army Reg. 600-43, ¶ 2-1(b).  At a minimum, Kanai was entitled to challenge the Army's proffered reasons for the late filing and might have argued for possible sanctions.

The entire package was then forwarded to the DACORB, the sole decision-making

authority for applications requesting discharge as conscientious objectors.  A.R. 232.  In

December 2008, the DACORB voted 3 to 2 vote to deny Kanai's application.[4]  The Chaplain and

Legal Representative of the Board voted in favor of the application, while the two Line Officers

and the President of the Board voted to deny his claim.  On June 18, 2009, Kanai filed the

present petition for habeas relief, seeking relief from the Army's custody.  On the same day, the

Court granted Kanai's Motion for a Temporary Restraining Order pending the Court's decision

on the merits of the case.

## II.

---

[d] Finally, the DACORB engaged in *ex parte* communication with the USMA while Kanai's application was pending before the DACORB.  According to the Declaration of the DACORB President, made known only when the Army filed its Reply to the Opposition to its Motion for Summary Judgment, during the administrative processing of Kanai's CO application, the DACORB discovered a form from the Academy that appeared to be an Oath of Office.  Declaration of Colonel Catherine D. Schoonover (Sept. 14, 2009).  Without advising Kanai, the DACORB contacted the USMA *ex parte* to verify the validity of the document.  *Id.* The Army advised the DACORB – but not Kanai – that the document was obviously incorrect and asked the DACORB to ignore the document.  Although the Army says the DACORB did not thereafter rely upon the document, once again it deprived Kanai the opportunity to challenge the document.  This point is also discussed more fully in the text *infra*.

Collectively, these procedural missteps show that the Army failed to scrupulously follow its own regulations in violation of the law of this Circuit, and demonstrated little regard for Kanai's due process rights.  *See Brooks v. Clifford*, 409 F.2d 700, 706 (4th Cir. 1969) (noting that the Army's regulations concerning conscientious objectors, "once issued must be followed scrupulously").

[4] Traditionally, the DACORB has been composed of three members.  On July 1, 2008, following a number of organizational changes within the Headquarters of the Department of the Army, the DACORB membership was increased from three to five members.  Declaration of Colonel Catherine D. Schoonover (Sept. 14, 2009).  Kanai's application was the tenth application to be reviewed by a five member panel.  *Id.*  The Court agrees with the Army that the size and composition of the DACORB were changed because of broader internal agency requirements and decisions prior to the review of Kanai's CO application, and were in no way occasioned by the pendency of Kanai's CO application.

**A.**

Federal district courts may entertain habeas petitions of conscientious objectors pursuant to 28 U.S.C. § 2241.  The scope of judicial review is narrow; the sole question is whether a "basis in fact" exists for the military's decision.  *See United States v. Philpot*, 346 F. Supp. 411, 415 (D. Md. 1972) (citing *Estep v. United States*, 327 U.S. 114 (1946)).  In the Fourth Circuit, the "basis in fact" test consists of two steps.  The applicant must first establish a *prima facie* case for classification as a conscientious objector.  *United States v. Wood*, 454 F.2d 765, 767 (4th Cir. 1972); *Philpot*, 346 F. Supp. at 414.  Once a *prima facie* case has been established, the Government has the burden of showing that there exists "any basis in fact" for the Government's denial of a CO application.  *See Cywinski v. Binney*, 488 F. Supp. 674 (D. Md. 1980) (citing *Brooks v. Clifford*, 409 F.2d 700, 705 (4th Cir. 1969)).[5]

A *prima facie* case is established if the applicant can demonstrate that: (1) he conscientiously opposes war in any form; (2) his opposition is based upon religious training and belief; and (3) his position is sincere.  *Clay v. United States*, 403 U.S. 698, 700 (1971).

The "basis in fact" standard is satisfied if there is objective evidence, even if not preponderant or substantial, to support the finding in question.  *Watson v. Geren*, 569 F.3d 115, 131 (2d Cir. 2009) (citation omitted).  The court does not decide whether the petitioner is a conscientious objector; it decides only if the decision made by the Board was based on facts that were before the military.  *United States v. Pritchard*, 413 F.2d 663 (4th Cir. 1969).  As indicated, the standard of judicial review is limited, having been described by Judge Friendly as the

---

[5] There do not appear to be many conscientious objector cases involving a USMA cadet. One other is *Donham v. Resor*, 436 F.2d 751 (2d Cir. 1971) (granting CO status and discharge of the cadet).

"narrowest [review] known to the law."  *United States v. Corliss*, 280 F.2d 808, 810 (2d Cir.

1960).

That said, although the "basis in fact" standard is narrow, it is not "toothless."  As the

Court of Appeals for the First Circuit recently explained:

> A basis in fact will not find support in mere disbelief or surmise as to the applicant's
> motivation.  Rather, the government must show some hard, reliable, provable facts which
> would provide a basis for disbelieving the applicant's sincerity, or it must show
> something concrete in the record which substantially blurs the picture painted by the
> applicant.  The DACORB's reasons for its decision must be grounded in logic and a mere
> suspicion is an inadequate basis in fact.

*Hanna v. Sec'y of the Army*, 513 F.3d 4, 12 (1st Cir. 2008); accord *Watson*, 569 F.3d at 131.

This comports with the Fourth Circuit's decision in *Peckat v. Lutz*, 451 F.2d 366, 369 (4th Cir.

1971), where the court held that in order to show a basis in fact, the military must show by

"affirmative evidence" that the applicant "did not sincerely hold his professed beliefs."  This

evidence must not be reached based on "speculation or hunch but by a rational process."  *Id.*

(citation omitted).  To demonstrate a rational process, "evidence buttressing an officer's

conclusion must be established in the record and *cited as supporting his determination*."  *Id.*

(emphasis added).

In evaluating whether a basis in fact exists for the denial of a CO application, the Court

begins by examining the reasons given by the DACORB for its denial.  The DACORB must state

its reasons for disapproval on the record, which is forwarded to the applicant.  Army Reg. 600-

43 ¶ 2-8(d)(3).  Requiring the DACORB to recite its reasons is essential to ensure that the

DACORB's decision is susceptible to meaningful review.  The proper focus of a reviewing

court, therefore, is on the reasons given by the DACORB for denying the application, "not on

reasons that may come to light if and when a court rummages throughout the record in an effort

to reconstruct on what basis the board might have decided the matter." *Checkman v. Laird*, 469 F.2d 773, 783 (2nd Cir. 1972); *see also Peckat*, 451 F.2d at 370 (holding that the reason for denial "must be made manifest in the decision itself.  It will not do to leave the matter in a state of ambiguity until some future day when government lawyers may devise an explanatory dissertation for inclusion in a defensive brief").

## B.

On June 9, 2008, an impartial IO from outside Kanai's chain of command was appointed to review the evidence, hold a hearing, and write a report.  A.R. 229.  In his report, the IO stated that he found Kanai to be sincere and determined that Kanai's "professed beliefs constitute conscientious objection" as defined by Army Regulation 600-43.  A.R. 30.[6]

Two of the five members of the DACORB also found in Kanai's favor.  According to the Chaplain member:[7]

> The applicant's objection to military service and to violence is clearly articulated and he has shown how his objection has developed over the years and why.  The record clearly shows an individual who is sincere in his opposition to war in any form, a position that developed through much contemplation and prayer and crystallized becoming fixed midway through his last semester.  I believe his beliefs to be firm and fixed, making him incompatible with service in the military.

The Legal Representative member also voted to grant Kanai's application, finding in pertinent part:

> The investigating officer determined that the applicant was sincere in his belief which is that war is immoral in all forms.  Applicant states that he is opposed to war in any form

---

[6] As represented by counsel for the Army at oral argument, while the IO personally interviewed Kanai and his witnesses, the DACORB, per its usual procedure, did not, basing its decision exclusively on the written record.

[7] Earlier in the proceedings, the Army asked that the names (as opposed to the titles) of the DACORB members not be disclosed, a request which Kanai and the Court acceded to.

and that he cannot serve in the military in any capacity.  Applicant states that his beliefs developed over time and crystallized in his fourth year at the USMA.  In this case applicant's veracity does not appear to be in question.  He has submitted numerous statements attesting to his character for truthfulness.

Based on the statements of Kanai, the recommendation of the IO, and the reasons provided by the two DACORB members who voted to grant the CO application, the Court finds that Kanai has established a *prima facie* case for classification as a conscientious objector and thus has met the first requirement for obtaining such classification.

## C.

Having found that Kanai has established a *prima facie* case for classification as a conscientious objector, the burden passes to the DACORB to point to a basis in fact in the record to support its decision.  The Court, then, turns to the opinions of the three DACORB members who voted to deny Kanai's application to determine if they had a basis in fact for their denials.  *See Nachand v. Seaman*, 328 F. Supp. 753, 759 (D. Md. 1971) ("Although it is not necessary for the Board's opinion to have recited every fact which supported its decision, there must be at least some coherent and rational basis outlined in the opinion to sustain the decision.").

The entirety of the First DACORB Line Officer's reasons for voting to deny Kanai's application was this:

> The applicant attempted to present lengthy and convincing evidence of his moral objections to war to his chain of command.  The applicant has not proven by action and deeds of his deeply held beliefs.  The applicant is convinced that his beliefs are sincerely held.  However, I do not see it in his thinking and living in totality, past, and present. It is obvious from the application that the applicant for some time had been questioning his core values, and future.  And even though he dabbled with other religious beliefs outside the norm, does not indicate pacifism or religious conversion or convictions.  Not that timing is or should be a consideration, yet one cannot help but notice his eleventh hour decision to seek resignation from the USMA.  I do believe that trying to utilize the tenants [sic] of A.R. 600-43 as an avenue of removal from the USMA is a stretch and probably instigated by civilian counsel.  The applicant in no way meets even the basic qualification for CO status.  A review of his packet including USMA application

documents, academic and intramural participation, in no way indicates any demonstration
of ethical or religious beliefs.  With the exception of the Investigation Officer, the four
levels of the applicant's chain of command did not recommend approval of CO status.
All staff and faculty of the USMA are to be commended in their thorough and in-depth
processing of the application.  The applicant wants out of his military obligation as a
result of his four years at USMA.  The Superintendent made the proper recommendation
for this resignation and discharge to proceed.  The issue of his being a Conscientious
Objector is not justified as he does not fall within the purview of the tenants of the
regulation.

This decision contains no basis in fact for denial, but rather consists of a string of

conclusory statements, several of which are clearly impermissible.  Curiously, the First Line

Officer concedes at the outset that "[i]t is obvious from the application that the applicant for

some time had been questioning his core values, and future."  But from there the First Line

Officer concludes that Kanai's behavior  "does not indicate pacifism."  This, however, applies an

unlawful standard, since an applicant is not required to be a pacifist in order to qualify for

discharge as a conscientious objector.  Army Reg. 600-43, ¶ D-4d ("A conscientious objector is

not necessarily a pacifist.").  The First Line Officer also finds no evidence of a "religious

conversion" on Kanai's part, another impermissible consideration, since "religious conversion"

is not required in order to qualify for conscientious objector status.  Army Reg. 600-43.  Further,

in referring to the timing of Kanai's application, the First Line Officer attempts to have it both

ways.  "Not that timing is or should be a consideration," he says, "yet one cannot help but notice

his eleventh hour decision to seek resignation from the USMA."  The time at which an

application for CO status is submitted is not by itself a basis-in-fact for rejecting an otherwise

acceptable CO claim as insincere, although, together with all evidence, it may be given weight.

*Goldstein v. Middendorf*, 535 F.2d 1339, 1344 (1st Cir. 1976).  The question remains whether

valid considerations in the First Line Officer's decision salvage the timing factor that he cites.

12

The Court finds none.

The First Line Officer appears to have been convinced by one particularly inappropriate consideration.  He states: "I do believe that trying to utilize the tenants [sic] of A.R. 600-43 as an avenue of removal from the USMA is a stretch and probably instigated by civilian counsel." This statement is wholly contrary to Army Regulation 600-43, which specifically authorizes an applicant to have civilian counsel represent him.  A.R. 226.  No negative reference may be drawn from the fact that a CO applicant chooses to pursue his application assisted by counsel. Engaging counsel and relying on counsel's strategy does not, as a matter of law, demonstrate Kanai's insincerity.  *See Greenwood v. Resor*, 439 F.2d 1249, 1252 (4th Cir. 1971) ("The difficulties of processing an application for conscientious objector discharge through administrative channels and the courts are not inconsiderable, and an applicant does not demonstrate insincerity by seeking expert advice.").  The Court finds no basis in fact for the First Line Officer's negative vote.

The Second Line Office's rationale is of a piece with the First Line officer's.  He writes in toto:

> I hereby vote to deny Cadet Kanai's application for Conscientious Objection (CO) 1-0 status.  Cadet Kanai did not present clear and convincing evidence that his convictions are sincerely held in his "thinking and living in totality past and present."  His logic for how his ethical and spiritual beliefs developed are questionable.  A three day weekend at a Buddhist Monastery and turning vegetarian is not sufficient evidence to substantiate his beliefs are sincerely held and govern his actions in word and deed.  Throughout the evidence presented there are subtle inconsistencies that lead me to fell [sic] this way.  For instance, Cadet Kanai claimed classmates would attest to his "understanding and peaceful disposition" yet in the statements he provided there is an indication that he was outspoken and perhaps confrontational about his views on Iraq and Afghanistan.  I realize this is trivial but another example is his Athletic and Extracurricular Activities.  From my viewpoint, rugby, football and boxing are very aggressive sports.  These activities certainly are not the outward manifestation consistent with a Conscientious Objector or someone opposed to "war" in any form.  His assertion that his willingness to leave West

Point after four years of rigorous study and physical trail [sic] without a degree and in
tremendous debt ($150k to $200k), speaks to his conviction and dedication.  These
actions hold no merit with me.  I will refrain from expressing my personal feelings.  For
these reasons I cannot vote to approve his Conscientious Objector Status.  I do believe he
wants out of his contract with the United States Military Academy.  The evidence
presented does not meet the regulatory requirements of A.R. 600-43.

This statement, quite simply, is neither coherent nor rational.  The Second Line Officer
finds inconsistency, hence insincerity, between Kanai's claim to have a "peaceful disposition"
and the fact that the statements Kanai provided suggest that "he was outspoken and perhaps
confrontational about his views on Iraq and Afghanistan."  There is no inconsistency between
these propositions.  One can be of "peaceful disposition," i.e. sincerely disposed to peace, and
still be "outspoken and perhaps confrontational" in his opposition to war.  Bona fide war
protesters have marched with signs and vocal passion for generations.  The Second Line
Officer's reference to Kanai's participation in rugby, football and boxing – "very aggressive
sports . . . not the outward manifestation consistent with a Conscientious Objector or someone
opposed to "war" in any form" – is not only ridiculous, it is blatantly impermissible.  One
assumes that the Second Line Officer may be unaware that Muhammad Ali, then known as
Cassius Clay, perhaps the greatest professional boxer of all time, was a conscientious objector
and the United States Supreme Court ringingly confirmed his status as such.  *See Clay v. United
States*, 403 U.S. 698 (1971).

Then there is the suggestion that Kanai has shown a "willingness to leave West Point,"
after "rigorous study" and "physical [trial];" in tremendous debt, all meant to be indicative of his
*lack* of conviction and dedication.  Logic would seem to point to a contrary conclusion: That
someone who would be willing to do all these things would be deeply sincere.  But that is not
what fatally taints this remark.  If willingness to leave the Academy were a legitimate basis in

14

fact for denying someone's CO status, then any cadet in the Academy who might seek to obtain

CO status could be automatically denied that status, an outcome clearly contrary to the whole

concept of allowing conscientious objector petitions.

There is, as well, the odd remark of the Second Line Officer that "[t]hese actions hold no

merit with me.  I will refrain from expressing my personal feelings."  This kind of remark hardly

becomes an impartial fact-finder since, – it is difficult to conclude otherwise – it fairly drips with

contempt and bias.  Truly impartial fact-finders do not need to declare to the world that they are

keeping their personal opinions to themselves.  That should go without saying.  The DACORB

owes a CO applicant better than this.

Finally, there is the DACORB President, the third vote denying Kanai's application.  The

totality of her statement is set forth as Attachment A to this Opinion.  Like the First and Second

Line Officers, the DACORB President offers speculation and conjecture for her denial of

Kanai's application, but at several points she also expresses her uncertainty as to Kanai's depth

of belief.  Consider these statements:

> Cadet Kanai makes a logical argument and presents a somewhat convincing history of
> how his believes evolved.
>
> ***
>
> Does he believe his assertions?  Yes, I think he does.
>
> ***
>
> Is he sincere when he states that?  Not sure.  I think he is sincere in wanting to avoid
> service.
>
> ***
>
> What is his guiding principle - his desire to depart USMA or his belief in nonviolence?  I
> believe that he has felt – probably the entire time he was at USMA – that he didn't fit in.
> I believe he has always had an underlying current directing him to find peaceful
> resolution an avoid violence but in this circumstance I believe that his guiding principle
> is his desire to depart USMA.
>
> ***
>
> Are [his beliefs] deeply held?  I don't know.

15

In conclusion, she states that it is her "*conjecture* that within another four years, his beliefs will change again - and will again appear sincere and deeply held" (emphasis added).  Uncertainty, conjecture, and speculation, of course, in no way provide a basis in fact for denying an application for CO status.  *See Dickinson v. United States*, 34 U.S. 389, 396-97 (1953) (holding that the denial of a conscientious objector claim on the basis of suspicion and speculation is not proper); *Nachand v. Seaman*, 328 F. Supp. 753, (D. Md. 1971) ("There must be a 'rational' basis in fact for the decision of the board, not merely speculative possibilities.") (citation omitted).

But what demonstrates beyond peradventure the unresolved conflict in the Board President's mind is the recommendation at the end of her memorandum, where she votes to deny Kanai's status as a 1-0 CO, but recommends that he be assigned to a "non-combatant MOS [Military Occupational Speciality]."  This is not only illegal; in effect, it concedes that Kanai is a sincere CO.  Under Army Regulation 600-43, an "applicant claiming 1-0 status will not be granted (1-A-0) status as a compromise."  A.R. 220; *see also Greenwood v. Resor*, 439 F.2d 1249, 1251 (4th Cir. 1971) (holding that a hearing officer "could not find [a conscientious objector] insincere and at the same time recommend that he be assigned noncombatant duties" because under Army Regulation, "an applicant can be classified as a noncombatant only if he has been found to be a conscientious objector").

Beyond the impermissible factors that informed the decisions of the three DACORB members who voted to deny Kanai CO status, there is a broader concern.  Profound personal umbrage pervades the opinions of several officers whose statements are part of the record.  How else to explain the recommendation of officers in Kanai's chain of command that he be transferred to active duty status as an enlisted man for "at least four" years (Lieutenant Colonel

Mundell), or "five years" (Major Van Antwerp), when the maximum authorized under law

appears to be three years?  Army Reg. 612-205, Table 3, Rule 7.  The statements of these

officers only underscore their bias.  Lieutenant Colonel Mundell believes that someone who asks

to resign from the USMA for reasons of conscientious objection "directly insults and

marginalizes the sacrifices of men and women in uniform that serve" and "places the cause and

duty of the Academy and our nation's military in jeopardy."  Allowing Kanai to resign, says

Lieutenant Colonel Mundell, "at this point in his development process is contrary to the purpose

of this institution and its duty to the Army and our nation."  A.R. 115.  Major Van Antwerp

recommends Kanai be placed in active service for a period of at least four years because "[t]o do

otherwise sets an unacceptable precedent."  A.R. 116.   Whatever personal views about duty to

the Academy and country these officers may shelter, their apparent distaste for any cadet who

might choose to ask for CO classification – that it "places the cause and duty of the Academy

and our nation's military in jeopardy" – not only prejudices Kanai's application; it runs counter

to the whole concept that CO status may be fairly sought by any and all military personnel,

USMA cadets included.[8]

     More troublesome still is the decision of Lieutenant General Hagenbeck, the Academy

Superintendent, to deny Kanai's application for resignation *before* the CO investigation was

completed.  The question is not whether the Superintendent acted illegally, but whether he acted

imprudently, to the extent that his declaration of position almost certainly affected the views of

---

     [8] In addition to officers in Kanai's chain of command, the chaplain who interviewed
Kanai during the CO process, pursuant to Army Regulation 600-43, displays comparable bias.
He criticizes Kanai for wearing the military uniform in his presence, apparently oblivious to the
requirement that Kanai had to obey orders and wear the uniform during the processing of his CO
claim.  A.R. 46, 221 (Army Reg. 600-43, ¶ 2-2b); A.R. 224 (Army Reg. 600-43, Statement of
Understanding).

the junior officers in the chain of command during the CO investigation.  There can be no

mistaking that in his application for resignation, Kanai made conscientious objector statements

as a reason for wanting to resign, even if he did not expressly use the term "CO."  The logical

and inescapable deduction from the fact that the Lieutenant General ordered that Kanai depart

the Academy but serve as an enlisted man is that the Superintendent is rejecting Kanai's claim of

being a CO, a perception the Staff Judge Advocate obviously entertained when she counseled the

Superintendent to defer his decision on the resignation application until the CO process was

complete.  What, then, were the chain of command officers during the CO process to infer from

this state of affairs?  Their superior, a Lieutenant General, in effect expresses his opinion against

CO status for Kanai, and coincidentally all four officer in the chain of command reach the same

conclusion.  How likely would there be dissent from the junior officers when the commanding

officer has already spoken?

The taint of the Superintendent's decision passed through to at least one DACORB

member, the First Line Officer, who wrote that "[t]he Superintendent made the proper

recommendation for this resignation and discharge to proceed."[9]

Finally, there is one particularly glaring instance in this case of the DACORB's

institutional bias in favor of the Army.  The Army submitted for the record a document signed by

Kanai and dated May 31, 2008, indicating that, although he had filed for conscientious objector

---

[9] Again, the Army makes much of the distinction between the resignation process and the
CO process.  In one of the documents in the record, for example, a statement is made to the
effect that Kanai's expression of willingness to resign to serve as an enlisted man evidences his
inconsistency and insincerity because he is saying he is still willing to serve in the military.  At
oral argument, however, counsel for the Army conceded that any individual seeking to resign
from the Academy has to be willing to serve as an enlisted man, i.e. the applicant has no choice
in the matter.  Insofar as this "fact" influenced the decision of a DACORB member who voted to
deny the CO application, it was clearly inappropriate.

status and been ordered to leave the Academy, he had nonetheless voluntarily stayed at the

USMA and was present at the Academy on the day of graduation, appearing before the

Superintendent to take the oath of a Second Lieutenant.  A.R. 139.  Someone connected with the

DACORB spotted an obvious problem.  How likely was it that Kanai, who at the same time was

seeking CO status, would be so blatantly inconsistent in his positions?  And so the DACORB –

*without advising Kanai and his counsel* – sent an *ex parte* communication to the Army asking for

clarification.  And the Army – *without advising Kanai and his counsel* – conceded that the

document was obviously incorrect, explaining to the DACORB – *but again not to Kanai or his*

*counsel* – that Kanai had actually signed the document months before it was "pen-signed" by the

supervising officer on May 31, 2008.  In other words, Kanai had not taken an oath of allegiance

on May 31, 2008.  But counsel for the Army was herself seriously misled by this document,

which she included in the Administrative Record (A.R. 139) and cited without qualification in

the Army's brief in support of its Motion for Summary Judgment.  It was not until the Army, in

its Reply to Kanai's opposition to its Motion for Summary Judgment, appended a declaration

from the DACORB President, that Kanai and his counsel became aware of this document or the

Army's effort to explain it away or the DACORB's insistence that it did not rely on the

document.  Here was a document as to which Kanai might have pursued vigorous impeachment,

an opportunity altogether foreclosed to him because the DACORB, unbeknownst to Kanai and

his counsel, gave the Government the chance to withdraw it.  The DACORB, says Army

counsel, ignored the document anyway so, as the saying goes, "No harm, no foul."  But what if

the DACORB had not sent the document back?  Kanai would then have been able to suggest to

the DACORB – as in fact he did to this Court in his opposition to the Army's Motion for

Summary Judgment before the Army proffered its explanation in its Reply brief – the obvious inaccuracy, possibly intentional misrepresentation, of the document, as part of his case that the Army was stacking the deck against him. Even if the Army might ultimately have explained the incorrectness of the document to the DACORB's satisfaction, Kanai still would have lost the advantage of casting doubt on the Army's bona fides in other respects. The DACORB had no business engaging in *ex parte* communication with the Army. If nothing else, its actions fortify the Court in its view, at least in this case, that the DACORB has paid far too much deference to the Army's interests.

## III.

Despite the contrary directives of the Fourth Circuit, the Army argues that the DACORB need not set forth all of the specific reasons for denying a CO application, so long as there is any basis in fact in the record for denying the application. The Court disagrees. The *Peckat* case expressly states that the reason for denial "must be made manifest in the decision itself. It will not do to leave the point in a state of ambiguity until some future day when government lawyers may devise an explanatory dissertation for inclusion in a defensive brief." *Peckat*, 451 F.2d at 370. Nevertheless, assuming *arguendo* that the Court was required to "rummage[] throughout the record in an effort to reconstruct on what basis the board might have decided the matter," *Checkman*, 469 F.2d at 787, the Court still finds questionable any basis in fact for the DACORB's denial.

Counsel for the Army has culled the administrative record and identified certain reasons the DACORB could have relied upon to deny Kanai's application. Counsel points to documents suggesting that Kanai's matriculation at West Point was marked by a pattern of equivocating and

inconsistent behavior.  Most notably, only months before he filed his CO application, Kanai

voluntarily increased his service obligation by three years in exchange for being placed in the

military speciality branch of his choice.  Referring to this decision, Kanai later told the chaplain

that he "did not know why [he] did this."  A.R. 49.   The Army argues that such action

evidences naivete on Kanai's part, inconsistent with a firm, fixed, and sincere objection to war in

any form or the bearing of arms.

        However, Army Regulation 600-43 explicitly recognizes that conscientious objection

may occur " . . . if old beliefs have matured gradually and taken on new meaning in his or her

life."  Army Reg. 600-43, ¶ D-4(e).  An applicant's beliefs may be sincere even if his views have

evolved over a period of time.  *See Champ v. Seamans*, 330 F. Supp. 1127, 1133 (D.C. Ala.

1971) (noting that "the fact that an applicant may have begun this evolutionary process of

thoughtful consideration cannot be considered sufficient to refuse the application") (citing

*Brooks v. Clifford*, 409 F.2d 700 (4th Cir. 1969)).  Gradual evolution of ideas does not

necessarily follow a linear path; lapses may occur along the way.  At some point – even late in

the day – sincerely held CO views crystallize.

        A rational and coherent appraisal of Kanai's evolution was provided by Paul Springer,

Assistant Professor of History at the USMA, in support of Kanai's CO application:

> Over the past year, I have had many interactions with CDT Kanai, both in and out of the
> classroom. . . . I have never had a reason to doubt the honesty and sincerity of CDT
> Kanai.  All of my interactions with him has led me to form the opinion that he is an
> intelligent, dependable, capable young man and not given to rash decisions.  It is to my
> great regret that he has chosen not to serve as an officer in the Army, for I believe he
> would have done so with distinction.

A.R. 55.

        The Army also argues that there is no record evidence of true lifestyle changes or

outward manifestations of Kanai's purported newfound beliefs as a conscientious objector.

Kanai, says the Army, never shared his beliefs with his friends or chain of command and the

only manifestation of his professed belief was an unproved claim of increased chapel attendance.

A.R. 1.  That is not a fair description of what the record contains.  There is ample evidence of

Kanai's manifestation of his beliefs to others, as evidenced by his CO application and six letters

from others in support of his application.  Significantly, the IO confirmed the manifestation of

Kanai's beliefs as a result of his investigation of both Kanai and his supporters.  A.R. 30-32.  He

stated:

> I find that Cadet Kanai is sincere in his beliefs . . .Throughout the investigation,
> interviews, and hearing, I have found consistent evidence that Cadet Kanai is a
> fundamentally honest person. . . . I have found a consistent description of Cadet Kanai's
> personality as quiet, thoughtful, and capable of examining deep questions from
> perspectives that are not commonly held.

A.R. 31.

In sum, even if it were permissible – and it is not – it avails the Army not at all to point to

"evidence" in the record the DACORB might have cited, but did not cite, in denying Kanai's

application.

## IV.

Having found that the three DACORB members who voted to deny Kanai's CO

application relied on impermissible grounds and that the Army deprived Kanai of fair access to

relevant documents during the process, the Court must decide whether the proper disposition is

to remand the case back to the DACORB for further considerations.  At oral argument, counsel

for the Army cited *Coates v. Laird*, 494 F.2d 709, 712 (4th Cir. 1974), for the proposition that

the "proper procedure in such a case where the record evidences alternative grounds [for denying

a CO application], one possibly valid and the other invalid, is to remand the proceedings to the service for reprocessing and for compliance with the requirement of a statement of reasons."

The problem in the present case, however, is one of taint – whether on remand the DACORB can fairly render a decision untainted by impermissible factors and influences. Presumably each of the three members who cited impermissible factors in denying Kanai's application would retract their faulty rationales. How much weight should the Court afford these retractions? The First Line Officer would have to concede that it does not matter that Kanai is not necessarily a pacifist or that he has not undergone a religious conversion or that Kanai's sincerity *vel non* has nothing to do with the fact that he was represented by an attorney who may have helped formulate the theories offered in support of his application. These considerations may well have tipped the scales in favor of the First Line Officer's negative vote the first time around. It seems altogether too facile to permit this decider to declare that these factors are no longer important, then permit him to search the record for previously uncited facts that might now buttress his decision. The Second Line Officer would have to change his views about the inconsistency of "violent sports" and peaceable attitudes and his general disapproval of cadets who seek CO status. What can be done about the personal opinion, apparently boiling beneath the surface about this case, that this decider found necessary to keep under control in registering his negative vote? And the DACORB President – can she now say she is able to decide with certainty and without conjecture? Would a profession of certainty on the basis of considerations she did not cite the first time around be more plausible than the profession of uncertainty based on the considerations she did cite? Finally, assuming remand could cure some of the taint, could remand cure the taint inherent in the Academy Superintendent's decision on Kanai's USMA

resignation application issued before his CO application was processed?  In the final analysis,
the Court concludes that where the DACORB has relied on substantial and numerous
impermissible factors in denying a CO application, where the Superintendent of the Military
Academy, a Lieutenant General, has effectively signaled to his junior officers that a grant of CO
status would be inappropriate, and where the process has been infected with multiple procedural
irregularities, there is no way to cure the taint that the impermissible factors and external
influences had upon the decision-makers.[10]  *See Goldstein v. Middendorf*, 535 F.2d 1339, 1344
(1st Cir. 1976) (declining to remand when the military ruled against a CO application on
impermissible grounds, and thereby displayed "ignorance of the permissible bases for denying a
CO claim," because the use of impermissible grounds "strongly suggest[s] that many of [the]
conclusions were unreliable because they were either infected with bias or based upon
ignorance").

## V.

For the foregoing reasons, the Court finds that Kanai has established a *prima facie* case
for classification as a conscientious objector and that there is no basis in fact for the DACORB
majority's conclusion that Kanai fails to qualify for CO status.  Accordingly, the DACORB's
denial of Kanai's application for discharge as a CO was unjustified.  Kanai's application for a
writ of habeas corpus will be **GRANTED**.  The Army is ordered to grant Kanai's application for
CO status and release him through immediate discharge.

---

[10] Alternatively, the Court finds remand inappropriate because, as discussed throughout,
there is no basis in fact for the DACORB's denial on any valid ground.  *See Coates*, 494 F.2d at
712 (noting that remand is the proper procedure "unless the record shows that there is 'no basis
in fact' for denial on any valid ground"); *Watson*, 569 F.3d at 129 ("[R]emand to the DACORB
is not necessary if remand would be futile."); *Hanna*, 513 F.3d at 16-17.

A separate Order will issue.

_____/s/_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

November 13, 2009